Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| M.L., a minor; C.D., his parent; S.L., his parent,<br>        *Petitioners-Appellants,*<br><br>v.<br><br>FEDERAL WAY SCHOOL DISTRICT; WASHINGTON SUPERINTENDENT OF PUBLIC INSTRUCTION,<br>        *Respondents-Appellees.* | No. 02-35547<br>D.C. No.<br>CV-01-00899-JCC<br><br>ORDER AMENDING OPINION AND DENYING PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC AND AMENDED OPINION |

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Chief Judge, Presiding

Argued and Submitted
August 7, 2003—Seattle, Washington

Filed November 5, 2004
Amended January 14, 2005

Before: Arthur L. Alarcón, Ronald M. Gould, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Alarcón;
Concurrence by Judge Gould;
Dissent by Judge Clifton

## COUNSEL

James E. Lobsenz, Carney Badley Spellman, P.S., Seattle, Washington, for the petitioners-appellants.

Christopher L. Hirst, Preston Gates & Ellis LLP, Seattle, Washington; James J. Dionne, Dionne & Rorick, Seattle, Washington, for the respondents-appellees.

## ORDER

This court's opinion, filed November 5, 2004, is amended as follows:

Insert footnote 9 to Section II slip op. at 15673, 387 F.3d at 1116, after the words "at least one regular education teacher."

The new footnote 9 reads as follows:

> Although I would apply the structural error analysis outlined above, I recognize that a majority of the panel has adopted a harmless error test instead. How harmless error review is to be conducted is therefore squarely presented. Therefore, I believe I should address the issue so that future panels confronted with it will have an expression of each of our views on this question.
>
> I cannot agree with Judge Clifton's analysis because he relies on the ALJ's and the district court's findings that the placement made by the procedurally defective IEP team was, nevertheless, harmless because it was the best placement for M.L. *See infra* at 15693-94 (Clifton, J. dissenting). This approach rewards procedural non-compliance and is at odds with the Supreme Court's holding that the IDEA seeks to achieve its substantive ends largely through procedural means:
>
>> [T]he importance Congress attached to [the Act's] procedural safeguards cannot be gainsaid. . . . We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that *adequate compliance*

*with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.*

*Rowley*, 458 U.S. at 205-06 (emphasis added).

Judge Clifton recognizes that *Rowley* mandates a two-step analysis. *See infra* at 15694 (Clifton, J., dissenting). Nevertheless, he appears to have jumped to the substantive second step to resolve the procedural first step, effectively circumventing the two-step process.

Even under the harmless error standard of review adopted by the majority, it is my view that loss of an educational opportunity cannot be determined by considering the merits of the placement identified in the IEP. Instead, it must be determined by whether the failure to include at least one regular education teacher, as expressly mandated by Congress, had a material and inherently harmful impact on the ability of the defective IEP team to develop a program that was reasonably calculated to enable M.L. to receive educational benefits. Thus, I believe the school district's procedural error was not harmless.

At slip op. 15689, 387 F.3d at 1124 n.1, modify the footnote by adding the following sentence after the first three sentences of the footnote following the words "and the conclusion" such that the footnote reads:

To be precise, while I agree with the main point of Section II-C, which is that the school district violated the procedural requirements of the IDEA, I do not join in the last sentence of that section. In that sentence Judge Alarcón applies the "structural defect" analysis contained in Section II-B of his

opinion to reach the conclusion that the district court's judgment must be reversed. I disagree with both the structural defect approach and the conclusion. Nor do I join in the footnote accompanying that sentence.

Insert a new footnote 3 (renumber subsequent footnotes accordingly) at slip op. 15695, 387 F.3d at 1127, at the end of the sentence "That being so, the district court properly held that even if there had been error in the composition of the IEP team, M.L. had not been denied a free, appropriate education."

The new footnote 3 reads as follows:

Judge Alarcón takes issue with my reliance on the district court's finding, not because he challenges the finding itself, but because he disagrees with my reliance upon that finding to conclude that the procedural error here was harmless. He criticizes my approach as being "at odds with" the two-step inquiry set forth in Supreme Court's decision in *Rowley* (and quoted in the text above), arguing that I have jumped to the substantive second step in order to circumvent the procedural first step. *Ante* at _____ n.9. I respectfully disagree. I give the same answer to the first *Rowley* question as both of my colleagues do: no, the school district has not complied with the procedures set forth in the Act. But *Rowley* does not say what happens when the answer to the first question is "no." Our court has previously held, and a majority of this panel holds again here, that a procedural error violates the Act only when it results in a lost educational opportunity for the child. There is nothing in *Rowley* which precludes consideration of the substantive impact on the child in determining whether there has been a lost educational opportunity due to a procedural error. Nor does my approach

involve the second *Rowley* question. Instead, the district court applied what I described above as a "tougher substantive standard." The second question under *Rowley* asks only whether the program was "reasonably calculated" to enable the child to receive educational benefits. The district court went beyond that here to find something more, that the proposed plan was the best program for M.L. That finding relates to the second step of *Rowley* in that it considers the *substantive* impact on the child rather than the *procedural* process employed to create the plan, but it is not the same inquiry.

With these amendments, Judge Alarcón and Judge Gould have voted to deny the petition for rehearing. Judge Clifton has voted to grant the petition for rehearing.

Judge Gould has voted to deny the petition for rehearing en banc. Judge Alarcón recommends that the petition for rehearing en banc be denied. Judge Clifton has voted to grant the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. No judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are Denied. No further petitions for rehearing will be entertained.

---

## OPINION

ALARCÓN, Senior Circuit Judge:

M.L., a minor, C.D., his mother, and S.L., his father, appeal from the order granting the motions for summary judgment

filed by Appellees, the Federal Way School District ("FWSD") and the Washington Superintendent of Public Instruction.[1] They contend, inter alia, that the failure of the FWSD to include a regular education teacher on the team that prepared M.L.'s individualized education program ("IEP") rendered the IEP invalid.

I am persuaded that we must reverse the order granting summary judgment because the failure of the FWSD to include a regular education teacher on the IEP team significantly deviated from the procedural requirements of the Individuals with Disabilities Education Act ("IDEA") that *at least one* regular education teacher be included in the development of an IEP for a student with a disability pursuant to 20 U.S.C. § 1414(d)(1)(B)(ii). This critical structural defect in the constitution of the IEP team precludes us from considering whether the IEP developed without the inclusion of at least one regular education teacher was reasonably calculated to enable M.L. to receive a free and appropriate public education ("FAPE"). I believe we must vacate the judgment and remand with instructions that the district court enter an order directing the FWSD to select an IEP team that complies with the procedural requirements of the IDEA.

Judge Gould has filed a separate concurring opinion in which he joins me in concluding that the omission of a regular classroom teacher from M.L.'s IEP team was a procedural error and that we must reverse the district court's order granting a summary judgment. Judge Gould has applied the harmless error standard of review, instead of the structural defect

---

[1] The complaint in this matter named the Washington Superintendent of Public Instruction ("SPI") as a party to this action. The district court granted summary judgment in favor of the SPI on the basis that the claim was "premature." While the notice of appeal refers to the order granting summary judgment to "respondent," the Appellants have not raised any issue challenging the merits of the summary judgment order in favor of the SPI. Thus, it would appear that the Appellants have abandoned their appeal regarding the SPI.

analysis I have employed, in concluding that the judgment must be reversed.

In his dissent, Judge Clifton agrees with Judge Gould that the harmless error test must be applied in this matter, but concludes that the school district's error in failing to include a regular classroom teacher on the IEP team, as required by the IDEA, was harmless error, and did not result in the loss of an educational opportunity for M.L., or deny him a free appropriate public education.

I

Unless otherwise indicated, the facts are undisputed. M.L. was born on November 13, 1994. He suffers from autism, mental retardation, and macrocephaly.[2] As of February 2001, he was globally delayed across all developmental domains consistent with his cognitive level, and displayed significant behavioral problems. M.L. was almost completely nonverbal, had virtually no communication skills, was not toilet trained, and had a cognitive ability that placed him in the first percentile on the Battelle Developmental Inventory.[3]

Dr. Ilene Schwarz, an expert regarding educational practices for children with autism, indicated that M.L. might be able to perform tasks with a familiar service provider, but would be unable to demonstrate those skills when asked to do so in another environment. M.L. had made gains in physical therapy between 1997 and 2000. The progress reports from Puget Sound Therapy Services indicate, however, that as of

---

[2]Macrocephaly is a condition that causes the distance around the widest part of the skull to be greater than expected for the age and background of the child.

[3]The Battelle Developmental Inventory Screening Test is administered to children six months to eight years old and includes subtests which measure fine and gross motor, adaptive, personal-social, receptive and expressive language, and cognitive skills.

August 2000, M.L. frequently had temper tantrums and displayed aggressive behavior such as hitting and pinching, which interfered with his performance in therapy. M.L.'s occupational therapist recommended that M.L. would benefit from a more structured environment.

M.L. was enrolled in the Tukwila Preschool at the Riverton Park United Methodist Church in the Tukwila School District in November 1997. He attended preschool four days per week for approximately two hours per day for three years. Except for a few months in his third year, M.L. was continuously assigned to Jodie Wicks's integrated preschool class until June 2000.[4] The class followed the same routine each day, using the same songs and activities. Each year the class also included several of the same students and the same instructional assistants.

M.L.'s skills improved over the course of his three years in Ms. Wicks's preschool class. M.L. began to interact more frequently with other children and participated, to a limited extent, in classroom activities. M.L. was teased a few times while enrolled there. During the three years he was enrolled in Ms. Wicks's class, he was assigned a one-on-one instructional assistant who remained with him throughout the day.

M.L. displayed increasingly aggressive behavior during that time. This conduct was documented by many of his service providers. His level of aggression escalated when he was frustrated or given more challenging tasks. He would cry, whine, or bite and scratch his instructional assistant. He mouthed many objects and on at least one occasion bit another child. Lai Doo, M.L.'s in-home therapist, testified that as M.L.'s level of communication increased, his level of aggression decreased. However, Ms. Doo also stated that

---

[4]An "integrated" or "regular" classroom consists of both typically developing children and a small number of disabled children. They are taught by a "regular education" teacher.

M.L.'s "level of aggression seem[ed] to be a lot more severe than the others that [she had] seen."

Because M.L. is disabled, the Tukwila School District was required by 20 U.S.C. § 1414(d)(1)(A) to create an IEP each year that stated M.L.'s "present levels of educational performance," outlined the "special education and related services . . . to be provided to [M.L.]," and set forth "measurable annual goals." On January 31, 2000, the Tukwila School District's IEP team prepared an IEP for M.L.'s initial placement for the 2000-2001 academic year ("Tukwila IEP"). Ms. Wicks, M.L.'s preschool teacher, was a member of the IEP team. The IEP provided that M.L. was to be enrolled in September 2000 in an integrated kindergarten class for 130 minutes, four times per week, and was to receive additional therapy and instructional services.

Prior to M.L.'s enrollment in an integrated kindergarten class in the Tukwila School District, M.L. and his family moved to the FWSD on or about July 30, 2000. M.L. was enrolled at the Mark Twain Elementary School in the FWSD. The FWSD implemented the Tukwila IEP for M.L. until it was due to expire on September 30, 2000. Accordingly, M.L. was placed in Sandy Ramsey's integrated kindergarten class in the Mark Twain Elementary School. Ms. Ramsey is certified as a regular and special education teacher.

At C.D.'s suggestion, Ms. Ramsey controlled M.L.'s behavior in class by letting him listen to his favorite music on his headphones. The FWSD hired a series of one-on-one instructional assistants to work with M.L. Each of them quit after working with him for one day.

C.D. attended class with M.L. during the five days that M.L. was enrolled at the Mark Twain Elementary School. On September 5, 2000, C.D. witnessed two boys teasing M.L. She discussed this incident with Ms. Ramsey and Pat Warden, Ms. Ramsey's classroom assistant. Ms. Ramsey responded

that she "would make a note and make it a priority to keep observing—keep an eye on these children and a better eye on [M.L.] to see if anything continued to happen so she could address any incidents that might happen." On September 6, 2000, C.D. observed more children teasing M.L. at recess. She reported this conduct to Ms. Ramsey and Ms. Warden. C.D. later testified, however, that M.L. was "happy as a little lark" during recess.

On September 7, 2000, C.D. again observed children teasing M.L. at recess and during class time. She discussed this conduct with Ms. Ramsey. Ms. Ramsey told C.D. that she "had not witnessed any teasing of M.L. during class, but would continue to watch for it and intervene if necessary." Ms. Ramsey informed C.D. that "policies were in place regarding teasing and that she did not allow such behavior in her class."

C.D. witnessed additional teasing incidents on September 8 and September 11, 2000. She reported these events to Ms. Ramsey. Ms. Ramsey replied that "she would keep an eye on [M.L.] and would take care of it." Ms. Ramsey did not take any action regarding the teasing incidents. C.D. testified that there was no evidence that M.L. was actually affected by the teasing and that "because he had his headphones on most of the time he was being teased . . . [she] didn't know if he even heard it."

On September 12, 2000, C.D. called Diane Niksich-Conn, the Vice-Principal of the Mark Twain Elementary School, to report a teasing incident that had occurred the previous day. Vice-Principal Niksich-Conn suggested that C.D. contact Ms. Ramsey. Ms. Niksich-Conn then contacted Ms. Ramsey and advised her to talk to C.D.

On September 13, 2000, Ms. Ramsey telephoned C.D. to discuss her complaint that M.L. had been teased on September 11, 2000. Ms. Ramsey informed C.D. that the teasing that

took place on September 11, 2000 was the only incident that she had observed. Ms. Ramsey testified that during that conversation, she requested that C.D. give her an opportunity to stop the teasing of M.L. by other children before C.D. took the matter further. M.L. did not return to the Mark Twain Elementary School after September 11, 2000. C.D. did not speak with the FWSD administrator before removing her child from the school.

On or about September 17, 2000, the FWSD offered to place M.L. at the Wildwood Elementary School in a self-contained classroom[5] taught by Teresa Thomas, a certified special education teacher with experience teaching autistic children. C.D. refused to enroll M.L. in the Wildwood Elementary School because she believed that a self-contained classroom would not provide for sufficient participation with regular education students. She thought that "it could be potentially dangerous for [M.L.]" to interact with the other students in the self-contained classroom. C.D. did not visit Ms. Thomas's classroom at any time.

After the Tukwila IEP expired on September 30, 2000, a multidisciplinary team met on October 6, 2000, to determine whether M.L. should be provided special education services in the FWSD.[6] A school psychologist, a speech and language

---

[5]A "self-contained" classroom consists of only disabled students.

[6]*See* 20 U.S.C. § 1414(a)(1)(A)-(B):

  (1)   Initial evaluations

     (A) In general

     A State educational agency, other State agency, or local educational agency shall conduct a full and individual initial evaluation, in accordance with this paragraph and subsection (b) of this section, before the initial provision of special education and related services to a child with a disability under this subchapter.

     (B) Procedures

pathologist, an occupational therapist, and C.D. participated in the initial evaluation. No regular education teacher participated in this assessment. In addition to observing M.L. for two hours, and interviewing C.D., the initial evaluation consisted of extensive review of records from providers identified by C.D. and the Tukwila IEP. The school psychologist also interviewed Ms. Wicks.

The group produced a report ("Evaluation Report") that recommended that M.L. be placed in a special education program that offered a small class size, provided visual supports, and predictable and consistent schedules and routines. On or about October 25, 2000, Dr. Sarah Drinkwater, FWSD's director of student support services, offered to place M.L. at the Wildwood Elementary School, the Mark Twain Elementary School, or several other schools within the FWSD. C.D. rejected each of these suggestions. On October 27, 2000, Appellants filed a written objection to the Evaluation Report. They also requested that the FWSD provide for an independent evaluation of M.L. at public expense. In response, the FWSD filed a request for a due process hearing.

On November 1, 2000, Dr. Lee Saffrey, a FWSD program specialist, mailed Appellants a letter proposing an IEP meeting for November 13, 2000 at 8:00 a.m. at the Wildwood Elementary School. C.D. faxed a letter to Dr. Saffrey on November 1, 2000, in which she stated that she would not attend any IEP meetings unless "the staff from [her] child's neighborhood school (Starlake Elementary)" were present and only if the meetings were held at the FWSD administration offices or the Starlake Elementary School. C.D. also indicated

---

Such initial evaluation shall consist of procedures—

    (i) to determine whether a child is a child with a disability (as defined in section 1401(3) of this title); and

    (ii) to determine the educational needs of such child.

that she would be available to attend an IEP meeting on November 13, 2000 after 6:00 p.m. On November 2, 2000, Dr. Saffrey notified C.D. that the location of the meeting had been changed to the administrative offices of the FWSD and that the meeting would occur at 4:00 p.m. on November 13, 2000. Dr. Saffrey also informed C.D. that Sarah Sapronari, a regular education and special education teacher, would be a member of the IEP team.

On November 6, 2000, C.D. faxed a letter to the FWSD in which she stated that she would not be able to attend the proposed IEP meeting at 4:00 p.m. on November 13, 2000. She stated that she would be available between 4:15 a.m. and 5:15 a.m., or at 6:00 p.m. on any Tuesday, Wednesday, Thursday or Friday, and at 7:00 p.m. or later on Mondays. She also suggested meeting on Saturdays or Sundays. Dr. Saffrey notified C.D. that an IEP meeting could be conducted only during the day from 7:00 a.m. to 4:00 p.m. on any day Monday through Friday. Dr. Saffrey informed C.D. that she could also participate via a conference call. C.D. replied on November 9, 2000, that she would not be able to attend an IEP team meeting during the hours and days suggested by Dr. Saffrey, nor could she or her husband participate in a conference call on November 13, 2000.

The Administrative Law Judge ("ALJ") found that the assertion that M.L.'s parents could not attend the IEP meeting at 4:00 p.m. was not credible. S.L.'s time sheet records from his employer indicate that on November 13, 2000, his workday ended at 2:58 p.m. At the hearing before the ALJ, C.D. testified that she was not able to attend the November 13, 2000 IEP team meeting at 4:00 p.m. or participate in a conference call because M.L. had an afternoon appointment on that day with Northwest Behavioral Associates. She stated she left home at 3:45 p.m. and did not return until 7:30 p.m. The ALJ found that this testimony was not credible. C.D.'s fax machine log reflected that C.D. sent a fax from her home on

November 13, 2000 at 5:05 p.m. The cover sheet was in C.D.'s handwriting.

The FWSD IEP meeting was held on November 13, 2000, at 4:00 p.m. Appellants did not attend. Ms. Thomas, a certified special education teacher assigned to the Wildwood Elementary School, was a member of the IEP team. However, no regular education teacher participated in the IEP meeting or evaluated the facts to determine whether the IEP was reasonably calculated to provide M.L. with a FAPE.

A letter written by Ms. Wicks, M.L.'s preschool teacher, dated May 10, 2000, was considered by the IEP team. She stated in this letter that "[M.L.] has made good progress in this setting and exceptional gains in socialization." She recommended that M.L. "remain[ ] in a general education kindergarten classroom during his kindergarten year and that he continue to be supported by a one-on-one assistant."

After reviewing the Tukwila IEP, M.L.'s school records, and Ms. Wicks's recommendation, the FWSD IEP team concluded that M.L. "would do better in a smaller setting with the opportunity to work on specific skill areas" and recommended placement in Ms. Thomas's self-contained classroom at the Wildwood Elementary School. The IEP provided for mainstreaming opportunities[7] during lunch, recess, assemblies, music, library, and school activities.

Ms. Thomas's curriculum incorporated specialized strategies for teaching autistic children. Ms. Thomas's self-contained classroom was smaller than an integrated kindergarten and was specially designed for students ranging from kindergarten through sixth grade.

---

[7]"Mainstreaming" is a term used to describe opportunities for disabled students to engage in activities with non-disabled students.

The FWSD mailed a copy of the IEP to M.L.'s parents on November 17, 2000. Dr. Drinkwater also enclosed a letter offering M.L.'s parents the opportunity to discuss and refine the IEP. M.L.'s parents did not do so, but instead requested a due process hearing before an ALJ with the Department of Education.

In February 2001, an eight-day due process hearing regarding the appropriateness of the IEP was held before an ALJ pursuant to the IDEA. The ALJ found that "the District's evaluation team was appropriately constituted." The ALJ denied Appellants' motion for reconsideration.

Appellants sought review of the ALJ's decision before the United States District Court for the Western District of Washington pursuant to 20 U.S.C. § 1451(i)(2)(A). In their petition for judicial review and complaint, Appellants alleged, inter alia, that the FWSD failed to comply with the procedural safeguards provided for under 20 U.S.C. §§ 1400-15, 34 C.F.R. §§ 300.1-.556, and Washington state law.

Appellants filed a motion for partial summary judgment in which they alleged that the FWSD violated the procedural requirements of the IDEA by failing to include a regular education teacher on the IEP team. The FWSD filed a cross motion for summary judgment. The district court denied Appellants' partial motion for summary judgment and granted the FWSD's motion. The district court found that because M.L. was new to the school district, and not participating in regular education classes at the time the IEP meeting took place, "it [was] permissible to include only teachers [on the IEP team] who are likely to be entrusted with him in the new placement." The district court also stated: "Even if the Court were to find that the district's failure to include a regular education teacher of M.L.'s on the IEP team amounted to a procedural violation of the IDEA, such violation would not necessarily constitute the denial of a FAPE." Appellants filed a timely notice of appeal on May 29, 2002. The district court

had jurisdiction pursuant to 20 U.S.C. § 1415(i)(2)(A). We have jurisdiction pursuant to 28 U.S.C. § 1291.[8]

## II

### A.

In this appeal, Appellants contend that the FWSD's failure to include a regular education teacher on the IEP team was a "significant violation" of the procedural requirements of the IDEA and renders the IEP invalid to ensure that a disabled child receives a FAPE. The FWSD argues in response that it did not violate the procedural requirements of the IDEA that at least one regular education teacher participate in evaluating the factors to be considered in the preparation of an IEP because three members of the team had "significant teaching experience." Appellees' Brief at 15. No authority was cited for this proposition. I construe this argument as a reluctant concession that at least one regular education teacher was not a member of the IEP team, as required by the IDEA. We

---

[8]The FWSD filed a motion with this court on December 24, 2002, requesting that we supplement the administrative record to include the testimony of Diane Niksich-Conn. In their supplemental letter brief, Appellants argue that normally a reviewing court will not supplement the record with material not considered by the district court. We have previously held, however, that "[i]n reviewing the record, this court must examine the administrative record as *a whole* . . . ." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990) (emphasis added); *see also* 20 U.S.C. § 1415(i) (2)(B)(1) (stating that in reaching its decision, a reviewing court is required to "receive the records of the [state] administrative proceedings"). In addition, Rule 10(e) of the Federal Rules of Appellate Procedure allows the record to be corrected if "anything material to either party is omitted from or misstated in the record by error or accident."

It is clear that Ms. Niksich-Conn's testimony was erroneously omitted from the administrative record considered by the district court. Since we are required to consider the entire administrative record in determining whether the district court erred in determining the appropriateness of a special education placement, we grant the FWSD's motion to supplement the record.

review de novo whether a school district's proposed IEP provides a FAPE under the IDEA. *W.G. v. Bd. of Trustees*, 960 F.2d 1479, 1483 (9th Cir. 1992) ("*Target Range*"). We review a district court's findings of fact in an IDEA case for clear error. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987).

The IDEA was enacted by Congress to assist state and local agencies financially in educating students with disabilities. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993). Its goal is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living . . . ." 20 U.S.C. § 1400. The term "free appropriate public education" is defined as "special education and related services that . . . are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(8). The term "individualized education program" is defined in the IDEA as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(11).

Section 1412(6)(A) provides that "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title." 20 U.S.C. § 1412(6)(A). A state is required to "conduct a full and individual initial evaluation . . . before the initial provisions of special education and related services to a child." 20 U.S.C. § 1414(1)(A).

**[1]** In § 1414(d)(1)(B), Congress set forth persons who must be included on an IEP team to evaluate a disabled student's special educational needs. The statute provides as follows:

The term "individualized education program team" or "IEP Team" means a group of individuals composed of—

(i) the parents of a child with a disability;

(ii) at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment);

(iii) at least one special education teacher, or where appropriate, at least one special education provider of such child;

(iv) a representative of the local educational agency who—

(I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

(II) is knowledgeable about the general curriculum; and

(III) is knowledgeable about the availability of resources of the local educational agency;

(v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi);

(vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the

child, including related services personnel as appropriate; and

(vii) whenever appropriate, the child with a disability.

20 U.S.C. § 1414(d)(1)(B).

**[2]** The IDEA also provides that "[t]he regular education teacher of the child, as a member of the IEP Team, shall, to the extent appropriate, participate in the review and revision of the IEP of the child." 20 U.S.C. § 1414(d)(4)(B). The regulations drafted to implement the IDEA contain the following provisions:

The public agency shall ensure that the IEP team for each child with a disability includes—

(1) The parents of the child;

(2) At least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment) . . . .

34 C.F.R. § 300.344(a).

In Appendix A to Part 300 of Title 34, the following commentary explains the critical role of a regular education teacher in developing an IEP:

Regular Education Teacher Participation in the Development, Review, and Revision of IEPs

Very often, regular education teachers play a central role in the education of children with disabilities (H. Rep. No. 105-95, p. 103 (1997); S. Rep. No. 105-17, p. 23 (1997)) and have important expertise regarding

the general curriculum and the general education environment. Further, with the emphasis on involvement and progress in the general curriculum added by the IDEA Amendments of 1997, regular education teachers have an increasingly critical role (together with special education and related services personnel) in implementing the program of FAPE for most children with disabilities, as described in their IEPs.

Accordingly, the IDEA Amendments of 1997 added a requirement that each child's IEP team must include at least one regular education teacher of the child, if the child is, or may be, participating in the regular education environment (*see* § 300.344(a)(2)). (*See also* §§ 300.346(d) on the role of a regular education teacher in the development, review and revision of IEPs.).

34 C.F.R. 300 app. A.

Prior to 1997, the IDEA provided that the school district was obligated to include the student's current teacher as a member of the IEP team. In 1997, Congress revised the IDEA to require the inclusion of "at least one regular education teacher of such child (if the child is, *or may be*, participating in the regular education environment)" and "at least one special education teacher, or where appropriate, at least one special education provider of such child." 20 U.S.C. § 1414(d)(1)(B) (2003) (emphasis added).

**[3]** The plain meaning of the terms used in section 1414(d)(1)(B) compels the conclusion that the requirement that least one regular education teacher be included on an IEP team, if the student may be participating in a regular classroom, is mandatory—not discretionary. Thus, the district court's finding that the IEP team was properly constituted under the IDEA without at least one regular education teacher

was clearly erroneous. Accordingly, we must decide whether the FWSD's failure to comply with the requirement of the IDEA that at least one regular education teacher evaluate the unique needs of a disabled student fatally compromised the integrity of the IEP and compels us to reverse the district court's judgment without considering whether the error was harmless or whether the findings of the ALJ and the district court that the IEP meets the substantive requirements of the IDEA are clearly erroneous.

### B.

**[4]** Citing *Poolaw v. Bishop*, 67 F.3d 830, 833 (9th Cir. 1995), FWSD contends that "[a] district court's determination that a student is incapable of deriving educational benefits unless placed in a self contained program is reviewed for clear error." Appellees' Brief at 21-22. This standard of review is only applicable to a district court's factual findings regarding whether a school district has complied with the IDEA. "The appropriateness of a special education placement under the IDEA is reviewed *de novo*." *Poolaw*, 67 F.3d at 833 (citing *Target Range*, 960 at 1483). Because FWSD violated the procedural requirement of the IDEA that at least one regular education teacher participate in the evaluation of an IEP, we are precluded by the law of this circuit from considering the district court's factual findings regarding the merits of the substantive provisions of the IEP.

In *Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982), the Supreme Court instructed that a state must comply both procedurally and substantively with the IDEA. *Id.* at 206-07. The Court held that "a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* (footnotes omitted). The Court reversed the judgment of the Court of Appeals which had

affirmed the district court's decision that a deaf child was denied a FAPE because school administrators denied her parents' request that she be provided with the services of a qualified sign language interpreter in all of her classes. *Id.* at 209-10. The Court held, "[T]he findings of neither court would support a conclusion that Amy's educational program failed to comply with the *substantive* requirements of the Act." *Id.* at 209 (emphasis added). While the Court concluded that the findings of the district court that the IEP complied with the substantive provisions of the IDEA were not clearly erroneous, it held that a remand was compelled because the district court failed to determine whether the state complied with the procedural requirements of the IDEA. *Id.* at 209-10. Here, the district court determined that the FWSD did not violate the procedural requirements of the IDEA. Thus, even if we assume *arguendo* that the findings of the ALJ and the district court in this matter that the IEP complied with the substantive requirements of the Act pursuant to *Rowley*, we must determine the effect on the district court's judgment of the FWSD's failure to comply with its duty under IDEA to appoint at least one regular education teacher to the IEP team.

To date, the Supreme Court has not expressly determined whether a violation of the procedural requirements of the IDEA is subject to harmless error review. That issue was not properly before it in *Rowley* because the district court had failed to rule on the respondents' contention that petitioners had failed to comply with the IDEA's procedural requirements. 458 U.S. at 210 n.32.

In cases decided after *Rowley* was published, we have concluded that we will not review the substantive provisions of an IEP if a school district fails to include on the IEP team persons identified by Congress as possessing the necessary qualifications to develop an IEP. In *Target Range*, we commented that "[p]rocedural flaws do not automatically require a finding of a denial of a FAPE. However, procedural inadequacies that result in the loss of educational opportunity, or seriously

infringe on the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." 960 F.2d at 1484 (internal citations omitted).

In *Target Range*, we held that the school district violated the procedures mandated by Congress in the IDEA by failing to secure the participation of the disabled student's regular education teacher, or any representative of the private school he attended after the school district refused to identify him as disabled or develop an IEP. We held in *Target Range* that "the procedural defects in the development of the IEP resulted in denying [the student] a FAPE." *Id.* at 1485. We reasoned that because the school district failed to consider the recommendations of persons who were the most knowledgeable about the child, it failed its "duty to conduct a meaningful meeting with the appropriate parties" and accordingly, it did not "develop a complete and sufficiently individualized educational program according to the procedures specified by the Act." *Id.* at 1485. We also concluded that where the procedural inadequacies of an IEP may have resulted in the loss of an educational opportunity, or deprived a child's parents of the opportunity to participate meaningfully in forming an IEP, an appellate court should not proceed to step two of the *Rowley* analysis, i.e., whether the IEP was reasonably calculated to enable the child to receive educational benefits. *Id.*

In *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877 (9th Cir. 2001), we applied the principles set forth in *Rowley* and *Target Range*. We concluded that the school district's procedural violations in developing an IEP prevented the child from receiving a FAPE. *Id.* at 890-91. In *Amanda J.*, the school district failed to allow the child's parents "to examine all relevant records with respect to the identification, evaluation, and educational placement of the child" as required by 20 U.S.C. § 1415(b)(1)(A). *Id.* at 891 (quoting 20 U.S.C. § 1415(b)(1)(A)). We held that "[p]rocedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *Id.* at 892.

We characterized the procedural violation as "egregious." *Id.* at 891. We declined to address the question whether the IEP was reasonably calculated to enable Amanda J. to receive educational benefits. *Id.* at 895 (citing *Target Range*, 960 F.2d at 1485).

More recently, in *Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072 (9th Cir. 2003), we held that the failure to include a representative from the private school that the child was currently attending on the IEP team violated the procedural requirements of the IDEA. We reasoned that the failure to include "the teachers most knowledgeable about [the child's] special educational levels and needs" was a violation of the IDEA. *Id.* at 1076-77. We concluded in *Shapiro* that it was not necessary to address the second prong of the *Rowley* FAPE analysis. *Id.* at 1079 (citing *Amanda J.*, 267 F.3d at 895, and *Target Range*, 960 F.2d at 1485).

The FWSD maintains that the failure to include at least one regular education teacher on the team that developed the IEP is not the type of procedural flaw that would compel us to hold that Appellants were denied their right to a FAPE. They cite our decision in *Ford v. Long Beach Unified Sch. Dist.*, 291 F.3d 1086 (9th Cir. 2002) for this proposition. Their reliance on *Ford* is misplaced. It is readily distinguishable.

In *Ford*, the state's hearing officer and the district court upheld the school district's assessment that a student was not disabled. *Id.* at 1087. Before this court, the student's parents contended that "the assessment [of Amanda's abilities and disabilities] was inadequate because it did not include classroom observation of Amanda by someone other than her regular education teacher as required by C.F.R. § 300.542." *Id.* at 1089. Because the student was assessed as not being disabled, no IEP was developed. We held in *Ford* that the failure to comply with the C.F.R. § 300.542 "did not affect the validity of the assessment." *Id.* at 1089. No contention was asserted in

*Ford* that the school district violated the procedural requirements of the IDEA by its failure to include an individual identified by Congress as necessary to evaluate a student's abilities or disabilities. Thus, our opinion in *Ford* does not resolve the question whether the failure of the FWSD to include at least one regular education teacher on the IEP prejudiced Appellant's rights to a FAPE.

**[5]** The record demonstrates that the FWSD failed to comply with the "rigorous procedural requirements of IDEA." *Union Sch. Dist. v. Smith*, 15 F3d 1519, 1524 (9th Cir. 1994). The failure to include at least one regular education teacher on the IEP team deprived the team of "important expertise regarding the general curriculum and the general educational environment." 34 C.F.R. 300 app. A. The IEP team did not include individuals Congress concluded were most knowledgeable about a disabled student's special educational needs. As a result, we have no way of determining whether the IEP team would have developed a different program after considering the views of a regular education teacher. The failure to include at least one regular education teacher on the IEP team was a structural defect in the constitution of the IEP team.

In cases involving criminal prosecutions, the Supreme Court has ruled that a structural defect in the trial mechanism is not subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991). We have defined a structural defect as "an error 'that permeate[s] the entire conduct of the trial from beginning to end or affect[s] the framework within which the trial proceeds.' " *United States v. Recio*, 371 F.3d 1093, 1102 (9th Cir. 2004) (quoting *Rice v. Wood*, 77 F.3d 1138, 1141 (9th Cir. 1996) (internal citations and quotation marks omitted)).

**[6]** The requirement that an appellate court must reverse because of the effect of a structural error has been applied in civil disputes where members of an evaluation board expressly mandated by Congress were not included. In *Doyle*

*v. United States*, 599 F.2d 984 (Cl. Ct. 1979), *amended on other grounds by* 609 F.2d 990 (Cl. Ct. 1979), the Court of Claims reversed the decision of the Army Board for the Correction of Military Records because none of the selection boards convened for the evaluation of reserve officers for promotion to permanent rank included any reserve officers, as required by 10 U.S.C. § 3362(b) (repealed and recodified at 100 U.S.C. § 14102(b)). The Court of Claims held that the failure to include reserve officers on the selection boards for evaluating reserve officers for promotion was not subject to harmless error analysis. It reasoned as follows:

> The error in this case, however, is not a violation of the plaintiffs' substantive rights but rather a violation of the plaintiffs' rights to fair procedure or process. We are not unmindful of the fact that the due process protections of the fifth amendment have been sparingly extended to government employees, but that problem is immaterial to this case. The error is the violation of procedures instituted by statute and regulation, and, though federal employees may not be entitled to any procedure not established by Congress or agency, we have always held that they are entitled to such procedure that has been so provided.

> Since this case presents the issue of procedural errors in the decision-making process of a selection board, we find those cases dealing with the violation of constitutional procedural rights to be more analogous. The Supreme Court has recognized that even in the case of constitutional error occurring in a criminal trial, not every such error requires "the automatic reversal of the conviction"; a conviction will be upheld if the "federal constitutional error . . . was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 22, 24, 87 S.Ct. 824, 827, 828, 17 L.Ed.2d 705 (1967). *See, e.g.*, *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d

284 (1969) (violation of sixth amendment right of confrontation); *United States v. Parker*, 549 F.2d 1217, 1221 (9th Cir. 1977), *cert. denied*, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977) (prosecutor's comment on defendant's failure to testify, in violation of fifth amendment).

Some constitutional rights, however, are "so basic to a fair trial that their infraction can never be treated as harmless error . . . ." *Chapman v. California*, *supra*, 386 U.S. at 23, 87 S.Ct. at 827 (coerced confession, right to counsel, impartial judge). These include cases in which compositional defects are found to exist in respect to juries. *See, e.g.*, *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Two justifications for the rule of automatic reversal are generally advanced. First, some errors are so inimical to judicial or fair process that their violation cannot be tolerated under any circumstances. Application of the test of harmless error would result in the dilution of the afforded protection. Second, a court, in the case of some errors, such as the improper composition of a jury or the bias of a judge, "has no way of evaluating the effect of the error on the judgment in the dark of what might have been but never was, . . . ." R. J. Traynor, *The Riddle of Harmless Error* 66 (1970).

Though the proceeding involved herein is evaluational, not accusatory, and the error statutory, not constitutional, we do not for these reasons believe that these plaintiffs are entitled to any less protection. Decisions of selection boards have important consequences for those considered. They are either promoted to higher rank and pay or are terminated and lose their employment and pay. The statute explicitly commands that selection boards shall be composed of an appropriate number of Reserve offi-

cers so that Reserve officers will not be prejudiced and so that Congress' purpose that the nation is protected by a military composed of those officers best qualified regardless of their status as Regular or Reserve officers, is carried out. We believe that Congress' purpose would be thwarted unless a Secretary is aware that this is a statutory requirement that cannot be waived.

Moreover, we believe that the second justification for the automatic reversal rule, that it is not possible for a reviewing body to determine what effect the error had on the judgment of the original proceeding, forces us to conclude that the doctrine of harmless error cannot be applied to this type of procedural error.

*Id.* at 995-96.

In *Dilley v. Alexander*, 603 F.2d 914 (D.C. Cir. 1979), the United States Court of Appeals for the District of Columbia held that the failure of the Army to include reserve officers on a promotion board violated 10 U.S.C. § 266 (1976). *Id.* at 920. The court rejected the Army's contention that the appellants were not prejudiced by the defect in the composition of the promotion board because a subsequently properly constituted Relook Board found that the defect in the composition of the 1975 promotion board did not result in any prejudice to the appellants. The court stated: "[T]he *prejudice* which the statute guaranteed against, insofar as reserve officers were concerned, was consideration by a promotion board devoid of reserve officers." *Id.* at 921 (emphasis in original). In addition, the court reasoned that the Relook Board's findings, "while laudable perhaps, are either irrelevant or incorrect as a matter of law. Although a desire to eliminate prejudice obviously occasioned the enactment of the statute, section 266 itself does not outlaw anti-Reserve bias. *It prescribes a procedural entitlement that no subsequent factual findings can*

*diminish.*" *Id.* at 923-24 (emphasis added). The court further commented in *Dilley* that, "Congress made a decision over a quarter of a century ago that a promotion selection board considering Reserve candidates was inherently defective if it lacked Reserve representation; the Army was not at liberty to review and reverse that congressional decision on its own." *Id.* at 924.

**[7]** I am persuaded by the analysis in *Doyle* and *Dilley* that the failure to include the individuals identified by Congress as necessary participants in evaluating whether entitlement to benefits has been demonstrated is applicable to an administrative proceeding under the IDEA. Accordingly, I conclude that the failure to include at least one regular education teacher, standing alone, is a structural defect that prejudices the right of a disabled student to receive a FAPE. Under these circumstances, a review of the findings of the ALJ and the district court regarding the merits of the substantive recommendations of an illegally constituted IEP team for clear error would produce a futile advisory opinion which is beyond our judicial power or competence.

## C.

The FWSD argues that the participation of a regular education teacher on the IEP team was not required because it was not likely that M.L. would be placed in an integrated classroom since the Evaluation Report recommended against it. This argument completely ignores the fact that the record shows that the Tukwila IEP directed that M.L. be placed in a regular kindergarten classroom. M.L. had attended a regular preschool classroom for three years. After his family moved to the FWSD, M.L. was placed in Ms. Ramsey's regular education classroom. This contention is also inconsistent with the FWSD's representation that "the District did not predetermine the Student's placement." Appellees' Brief at 35. In light of these facts, the record supports an inference that it was possible that M.L. would be placed in a regular education class-

room. So long as this was a possibility, participation of a regular education teacher in the IEP team was required by the IDEA.

The FWSD was aware that two teachers had observed M.L. in an integrated classroom. Ms. Ramsey had observed him for one week before his mother withdrew him because he was teased by non-disabled children. Ms. Wicks had observed M.L. for three years in an integrated preschool classroom. Of the two regular education teachers, Ms. Wicks was the most knowledgeable about M.L.'s educational needs because she had been his teacher for three years. She recommended that M.L. be placed in an integrated classroom. The FWSD did not include either Ms. Ramsey or Ms. Wicks or any other regular education teacher on its IEP team.

The FWSD appears to suggest that the Appellants waived their right to object to the failure to include a regular education teacher on the IEP team because they failed to attend the IEP meetings. The FWSD argues that "[t]he District attempted to facilitate the Parents' participation in the IEP meeting but the Parents refused to attend. Their refusal to participate was at their own risk." Appellees' Brief at 36-37. We rejected a similar argument in *Target Range*:

> *The Act imposes upon the school district the duty to conduct a meaningful meeting with the appropriate parties*. Target Range failed to do so. Target Range failed to fulfill the goal of parental participation in the IEP process and failed to develop a complete and sufficiently individualized educational program according to the procedures specified by the Act.

960 F.2d at 1485 (emphasis added).

The FWSD's assumption-of-the-risk defense betrays its misunderstanding of the importance of the procedural requirements of the IDEA. The Supreme Court stated in *Rowley*, that

"[w]e think that the congressional emphasis upon full partici-pation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of the substantive content in an IEP." *Id.* at 206.

Clearly, under the circumstances of this case, Ms. Wicks was a concerned party regarding the placement of M.L. in an integrated classroom because he was her student for three years. Because she was not included in the IEP team, we have no way of ascertaining whether her observations would have persuaded the other team members to formulate a different program for M.L. that would be appropriately tailored to his abilities and special needs. Ms. Ramsey's more limited obser-vation of M.L. in her integrated classroom might also have assisted the IEP team in ensuring that M.L. received a FAPE based on his physical and mental condition. Indeed, any regu-lar education teacher would have contributed his or her knowledge of the ability of a disabled student to benefit from being placed in a regular classroom. The Appellants are not responsible for the FWSD's violation of the procedural requirements of the IDEA.

The FWSD argues that it was not compelled to ensure the participation of a regular education teacher "because the evaluators had recommended a self-contained placement." Appellees' Brief at 28. This argument ignores the fact that although the FWSD named a regular education teacher to be a member of the IEP team, she did not attend the November 13, 2000 meeting. Having determined a regular education teacher should be a member of the IEP team, the FWSD should have cancelled that meeting instead of proceeding with an illegally constituted IEP team.

**[8]** Under the law of this circuit, the FWSD violated the procedural requirements of the IDEA, by failing to ensure the participation of a regular education teacher in the evaluation

of M.L.'s educational needs. This structural defect compels reversal of the district court's judgment without considering the merits of the IEP developed without the evaluation of at least one regular education teacher.[9]

---

[9]Although I would apply the structural error analysis outlined above, I recognize that a majority of the panel has adopted a harmless error test instead. How harmless error review is to be conducted is therefore squarely presented. Therefore, I believe I should address the issue so that future panels confronted with it will have an expression of each of our views on this question.

I cannot agree with Judge Clifton's analysis because he relies on the ALJ's and the district court's findings that the placement made by the procedurally defective IEP team was, nevertheless, harmless because it was the best placement for M.L. *See infra* at 639-40 (Clifton, J. dissenting). This approach rewards procedural non-compliance and is at odds with the Supreme Court's holding that the IDEA seeks to achieve its substantive ends largely through procedural means:

> [T]he importance Congress attached to [the Act's] procedural safeguards cannot be gainsaid. . . . We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that *adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP*.

*Rowley*, 458 U.S. at 205-06 (emphasis added).

Judge Clifton recognizes that *Rowley* mandates a two-step analysis. *See infra* at 640 (Clifton, J., dissenting). Nevertheless, he appears to have jumped to the substantive second step to resolve the procedural first step, effectively circumventing the two-step process.

Even under the harmless error standard of review adopted by the majority, it is my view that loss of an educational opportunity cannot be determined by considering the merits of the placement identified in the IEP. Instead, it must be determined by whether the failure to include at least one regular education teacher, as expressly mandated by Congress, had a material and inherently harmful impact on the ability of the defective IEP team to develop a program that was reasonably calculated to enable M.L. to receive educational benefits. Thus, I believe the school district's procedural error was not harmless.

### III

The Appellants further assert that M.L. was denied a FAPE because the FWSD failed to take action to prevent other students from teasing M.L. The Appellants argue that there is uncontradicted evidence in the record that the FWSD was deliberately indifferent to C.D.'s reports that her child was being teased. They maintain that the teasing resulted in a denial of a FAPE. Neither the statute nor any court has directly addressed the question whether unremedied teasing can constitute a denial of a FAPE. *Cf. Charlie F. ex rel. Neil F. v. Bd. of Educ.*, 98 F.3d 989, 993 (7th Cir. 1996) (holding that, "at least in principle relief is available under the IDEA" when a teacher invited her pupils to express their complaints about a disabled student which led to humiliation, fistfights, mistrust, loss of confidence and self-esteem, and disruption of his educational progress).

Under the IDEA, a disabled child is guaranteed a FAPE, 20 U.S.C. § 1412(1), which " 'provide[s] *educational benefit* to the handicapped child.' " *Gregory K.*, 811 F.2d at 1314 (quoting *Rowley*, 458 U.S. at 201) (emphasis added). If a teacher is deliberately indifferent to teasing of a disabled child and the abuse is so severe that the child can derive no benefit from the services that he or she is offered by the school district, the child has been denied a FAPE. *Cf. Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999) (holding that to violate Title IX "harassment . . . [must be] so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit").

The record shows that by removing M.L. from Mark Twain Elementary School after only five days, Appellants failed to give the FWSD a reasonable opportunity to find a way to prevent the other students from teasing M.L. Appellants have also failed to demonstrate that teasing resulted in the loss of an educational benefit. Appellants have offered no evidence that the teasing affected M.L. or interfered with his education.

C.D. testified that during one of the teasing incidents, M.L. was "happy as a little lark." C.D. also stated that during another episode "because he had his headphones on most of the time he was being teased . . . [she] didn't know if he even heard it."

**[9]** Appellants contend, without evidentiary support, that unpunished teasing "can easily escalate from mere verbal abuse, to physical or sexual abuse" and is "potentially dangerous." Appellants' Brief at 52, 54. Appellants also argue that teasing poses a particular danger to M.L. since, because he has little or no verbal skills, he would be unable to report any physical abuse. However, Appellants have not directed this court's attention to any violence, or threat of physical contact between another student and M.L. Appellants have not adduced sufficient evidence to show that M.L. was denied a FAPE by the FWSD's alleged failure to stop M.L.'s classmates from teasing him during his five days in a regular education classroom.

## CONCLUSION

The FWSD's failure to ensure the participation of a regular education teacher on the IEP team when there was a possibility that M.L. would be placed in an integrated classroom was a significant violation of the structural requirements of the IDEA's procedures requiring vacation of the order granting summary judgment in favor of the FWSD. Upon remand, the district court is instructed to enter an order directing the FWSD to select an IEP team that fully complies with the procedural requirements of the IDEA.

Upon remand, the district court is requested to determine, in its discretion, whether to award reasonable attorneys fees as part of the costs to the Appellants as the prevailing parties pursuant to 20 U.S.C. § 1415(i)(3)(B). The district court should also determine whether the Appellants are entitled to equitable reimbursement for the educational costs they have

incurred due to the FWSD's procedural violation of the IDEA.

**VACATED** and **REMANDED** with instructions.

**Volume 2 of 2**

GOULD, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the judgment and in Sections I, II-A, II-C, and III of Judge Alarcon's opinion. I agree that 20 U.S.C § 1414(d)(1)(B)(ii) requires that at least one regular education teacher be included on an Individualized Education Program ("IEP") team, and that the omission of a regular education teacher from M.L.'s IEP team was procedural error. However, I do not agree with the *per se* "structural defect" analysis adopted by Judge Alarcon in Section II-B. I write separately to make clear that our court's procedural analysis under IDEA does not start and end with automatic reversal based on a theory of structural error. Instead, we must assess the school district's error for harmlessness—in accord with our precedent in *Target Range*, *Amanda J.*, and *Shapiro*—by considering whether the procedural error resulted in a loss of educational opportunity or significantly restricted parental participation in the IEP formation. IDEA procedural error may be held harmless in appropriate cases, and this may include cases involving a mistake in how the IEP team was constituted. Although Judge Clifton in dissent and I in concurrence agree on the rejection of structural error and on the standard for assessing harmless error, we reach different conclusions in the application of the governing standard.[1] We both agree that the harm-

---

[1] Judge Clifton's dissent states:

> Finally, I agree with Judge Gould, as expressed in Section I of his opinion, that a structural error analysis is not supported by our caselaw and has no place in the IDEA context. As Judge Gould correctly observes, a procedural violation constitutes a denial of a free and appropriate public education only when it results in a lost educational opportunity for the child or significantly restricts parental participation in formation of the IEP.

Dissent at 635.

Judge Clifton in his dissent concludes that the error in composition of the IEP team was harmless under the same standard I apply. Our differences turn in part on our disagreement on whether the assessment of loss of educational opportunity is a question of fact to be reviewed for clear error, or a mixed question of fact and law, to be reviewed de novo, as can be seen from a comparative review of our opinions, which apply the same standard but reach contrary results.

less error assessment turns here on whether there was a "loss of educational opportunity" for M.L. Applying this correct test for harmless error, I further conclude that the error in composition of the IEP team, under the circumstances of this case, caused a violation of the IDEA and requires reversal of the district court's order granting summary judgment.

In Section I, I explain what I believe to be the controlling test for harmless error under our case law and why I believe a structural defect analysis is inapplicable in an IDEA context. In Section II, I apply the harmless error test to the facts in the record, and conclude that the procedural error in this case was not harmless. Hence, I concur in the judgment reached by Judge Alarcon, but not the structural error analysis that he advances.

I

A

In *Board of Education v. Rowley*, 458 U.S. 176, 206-207 (1982), the Supreme Court established a framework for IDEA review: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" In applying this standard, our cases (and those of our sister circuits) have not adopted a structural error approach. Instead, each case treats the procedural prong of *Rowley* as having two subparts: First, was there a procedural violation of the IDEA, and second, if there was error, did it affect the substantive rights of the plaintiff. *See* 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.").

The test for determining whether IDEA procedural error affects the substantial rights of the parties has been established by our prior precedent. In *W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992) ("*Target Range*"), we stated: "Procedural flaws do not automatically require a finding of a denial of a FAPE. However, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *Id.* (internal citations omitted).[2] Our more recent cases follow the *Target Range* procedural error analysis. *See Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072, 1079-1080 (9th Cir. 2003) (quoting and applying the *Target Range* standard in holding that the omission of a child's parents and a teacher from her prior school were procedural violations in the creation and composition of her IEP team which amounted to the denial of a FAPE because they "resulted in the loss of educational opportunity for [the child]") *superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B); *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 891-892 (9th Cir. 2001) (applying the *Target Range* analysis to an "egregious" IDEA procedural error instead of granting automatic reversal). In sum, our precedents in *Target Range*, *Amanda J.*, and *Shapiro* establish that not all procedural violations by a school district in imple-

---

[2]In *Target Range*, we addressed whether omissions in the formulation of an IEP constituted the denial of a free appropriate public education ("FAPE"). The district court had held in favor of the plaintiff family, finding that the Target Range school district had failed to include important parties—the child's parents, regular education teacher, or a representative of the private school the child had also attended—in the IEP development. 960 F.2d at 1483-1484. We affirmed, holding that "Target Range clearly did not comply with the procedures required by the IDEA." *Id.* Our analysis elaborated that procedural errors do not amount to a *per se* denial of a FAPE, but, rather, that we will find that a FAPE has been denied where procedural inadequacies result in the "loss of educational opportunity," or when such errors "seriously infringe" parental ability to participate in the IEP process. *Id.* at 1484.

menting the IDEA will necessarily result in the denial of a FAPE. Procedural error—including in M.L.'s case the omission of members of an IEP team—constitutes the denial of a FAPE only when it results in lost educational opportunity for the child, or when it significantly restricts parental participation in the IEP formation. *See Target Range*, 960 F.2d at 1484; *Shapiro*, 317 F.3d at 1079; *Amanda J.*, 267 F.3d at 892; *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1129 (9th Cir. 2003) *superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B).

## B

Judge Alarcon characterizes the absence of a regular education teacher from M.L.'s IEP team as a "structural error" or a "structural defect" that is not subject to harmless error analysis. Judge Alarcon's Opinion at 612. In doing so, he extrapolates from the criminal context, where the Supreme Court has immunized certain errors that affect the constitutional rights of defendants from harmless error review. *See generally Arizona v. Fulminante*, 499 U.S. 279, 309-310, (1991); *Chapman v. California*, 386 U.S. 18, 22-24 (1967).[3]

While one might in other contexts applaud a creative solution to a difficult case, I find this structural error analysis strikingly inapplicable in our civil case context, where we are asked to assess whether a school district has infringed a child's rights to education consistent with the IDEA. Even in

---

[3]In support of his extension of this concept to our civil case, Judge Alarcon cites two 1979 cases external to our circuit addressing promotional evaluation boards in the United States Army, *Doyle v. United States*, 599 F.2d 984 (Cl. Ct. 1979), and *Dilley v. Alexander*, 603 F.2d 914 (D.C. Cir. 1979). *Doyle* and *Dilley* analogized to the structural defect cases discussed in *Chapman*, holding that the omission of statutorily-mandated reserve officers from military boards evaluating reservists for promotion was a structural error which was *per se* prejudicial and precluded any subsequent harmless error review. *Doyle*, 599 F.2d at 995; *Dilley*, 603 F.2d at 921-924.

the realm of constitutional error in criminal prosecutions, where life and liberty are at stake, the Court has made clear that the situations where we will find structural error requiring automatic reversal are a "very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468 (1997).[4] Structural errors are the "exception and not the rule," *Rose v. Clark*, 478 U.S. 570, 578 (1986), and "most constitutional errors can be harmless." *Fulminante*, 499 U.S. at 306.

Judge Alarcon cites no precedent applying structural error in civil cases in our circuit, and I have found none, nor has he cited any IDEA-specific cases in our circuit applying a structural error test to procedural error.[5] Moreover, Judge Alarcon does not cite any examples of IDEA structural error analysis from other circuits. In fact, our sister circuits have consistently rejected *per se* IDEA structural error arguments, and instead have adopted case-by-case, harmless error inquiries similar to our standard, which I have reviewed above.[6] Nor

---

[4]In emphasizing the narrowness of this limited universe of structural defects warranting *per se* relief, the Supreme Court, in *Neder v. United States*, 527 U.S. 1, 8 (1999), cited key cases identifying such defects:

> *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable doubt instruction).

[5]The two Ninth Circuit cases cited by Judge Alarcon to define structural error both concern the constitutional rights of criminal defendants. *United States v. Recio*, 371 F.3d 1093, 1101 (9th Cir. 2004); *Rice v. Wood*, 77 F.3d 1138, 1141 (9th Cir. 1996). They are inapposite in this IDEA context.

[6]*Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003) (citing *Target Range*, 960 F.2d at 1484, and holding that "even if the

does the structural error position in IDEA litigation find any support in the text or legislative history of the IDEA. In the absence of guidance from the Court or Congress, we should conclude that IDEA cases are subject to the general principle

---

determination of [the child's] IEP was procedurally deficient in some respects, he has not established that any procedural deficiency resulted in a loss of educational opportunity or infringed his parents' opportunity to participate in the IEP process"); *DiBuo v. Bd. of Educ.*, 309 F.3d 184, 191 (4th Cir. 2002) (rejecting the argument that a procedural IDEA violation should constitute a *per se* denial of a FAPE); *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 533 (4th Cir. 2002) (holding that "[w]hen such a procedural defect exists, we are obliged to assess whether it resulted in the loss of educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of IDEA"); *T.S. v. Indep Sch. Dist. No. 54*, 265 F.3d 1090, 1095 (10th Cir. 2001) ("Procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of educational opportunity."); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001) ("[A] procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents. . . . [P]rocedural violations that deprive an eligible student of an [IEP] or result in the loss of educational opportunity also will constitute a denial of a FAPE under the IDEA."); *Weiss v. Sch. Bd. of Hillsborough County*, 141 F.3d 990, 996 (11th Cir. 1998) ("For the [plaintiff family] to prove that [their child] was denied a FAPE, they must show harm to [the child] as a result of the alleged procedural violations. Violation of any of the procedures of the IDEA is not a *per se* violation of the Act."); *Heather S. v. Wisconsin*, 125 F.3d 1045, 1059 (7th Cir. 1997) (quoting the *Target Range* standard); *Indep. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996) ("An IEP should be set aside only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.") (internal quotation marks omitted); *Murphy v. Timberlane Reg. Sch. Dist.*, 22 F.3d 1186, 1196 (1st Cir. 1994) ("[N]ot every procedural irregularity gives rise to liability under the IDEA. Nevertheless, procedural inadequacies [that have] compromised the pupil's right to an appropriate education . . . or caused a deprivation of educational benefits are the stuff of successful IDEA actions.") (internal quotation marks omitted); *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52-53 (1st Cir. 1992).

of harmless error that applies generally in civil and criminal law contexts. *See* 28 U.S.C. § 2111; Fed R. Crim. P. 52(a); Fed. R. Civ. P. 61.

Judge Alarcon's structural error analysis disclaims a general applicability and purports to be limited, advocating a *per se* rule of reversal only for the violation of one procedural requirement of the IDEA: 20 U.S.C. § 1414(d)(1)(B)(ii), the requirement that an IEP team include a regular classroom teacher. However, Judge Alarcon sets forth no persuasive qualitative distinction between § 1414(d)(1)(B)(ii) and the other procedural requirements of the IDEA, which too are important.[7] Consequently, Judge Alarcon's opinion posits no necessary or logical stopping point prohibiting future courts from applying a structural error approach to virtually any IDEA procedural error. In my view, the best means by which to differentiate between such errors is to evaluate each one individually—as colored by each case's particular facts—and to apply a uniform standard that assesses lost educational opportunity or lost parental participation, not by adopting a

---

[7]Judge Alarcon emphasizes that the 1997 IDEA amendments revised the language of this provision, changing the IEP team requirement from the current teacher, when general education is a real possibility, to both a regular classroom teacher and a special education teacher. Op. at 607; *compare* 20 U.S.C. § 1414(d)(1)(B) (2003), *with* 20 U.S.C. § 1401(a)(20) (1996). But the 1997 IDEA amendments were numerous and substantive, affecting the entire statutory scheme, and reworking several procedural requirements, including other aspects of the IEP process. *See generally* Dixie Snow Huefner, *The Individuals With Disabilities Education Act Amendments of 1997*, 122 Ed. L. Rep. 1103 (1998). Other "[m]ajor new requirements were added to the IEP section." *Id.* at 1112-15. We accounted for Congress's purpose and focus, when it amended the provision, by our holding that it had been violated, and by rejecting the school district's array of defensive arguments. Yet, there is nothing in the statute or its regulations from which to conclude that those changes necessitate that § 1414(d)(1)(B)(ii) have its own structural defect procedural error analysis, separate and apart from the analysis applied to the other equally important IDEA procedural requirements, and at odds with the general course of civil and even criminal law.

*per se* rule that insulates a subset of errors from future review. It should not be forgotten that, in interpreting IDEA, we, like the school district, parents, and the advocates participating in administrative hearing and in the courts, are trying to determine what is best for a disabled child.

## II

Accordingly, my analysis takes me back to where I commenced, applying the *Target Range* standard to determine whether the procedural error in IEP team composition amounted to denial of a FAPE by either excluding appropriate parental participation or causing a lost educational opportunity for the child. This case poses no genuine issue of whether a parent of M.L. was excluded from the IEP process,[8] and so the controlling issue becomes whether the failure to include a regular education teacher on the IEP team resulted in a "loss of educational opportunity" within the meaning of the test established in *Target Range*. I am persuaded that, under the total circumstances, M.L. lost an educational opportunity because the FWSD violated the procedural requirements of the IDEA by failing to include a participating regular education teacher on the IEP team.[9]

---

[8]Appellants do not contend that the FWSD's procedural error significantly restricted their participation in the IEP process.

[9]We review de novo the district court's conclusions of law. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987). Judge Clifton concludes that the question of harmless error is one of fact and that we review the district court's findings for clear error. Dissent at 642-43. His analysis must concede, however, that the district court did not "fram[e] [its] discussion in terms of 'loss of educational opportunity' " and that "the meaning of the phrase 'lost educational opportunity' " is a legal question. Dissent at 637, 642 n.4. For these reasons, the question of whether M.L. has "los[t] an educational opportunity" under the IDEA is a mixed question of law and fact which we review de novo. *Gregory K.*, 811 F.2d at 1310; *Target Range*, 960 F.2d at 1483 (holding that the issue of whether a proposed IEP constitutes a FAPE is a mixed question of law and fact that we review de novo).

The statutory requirement that an IEP team for a disabled child who is or may be in regular education must include a regular education teacher is not merely technical. A regular education teacher may have insights or perspectives that aid the process of IEP formation. We need not say that error in composition of an IEP team is always prejudicial and invariably results in the denial of a FAPE. Rather, we should assess the circumstances of each case, and here the record demonstrates that the failure to include Ms. Ramsey or Ms. Wicks or any other regular education teacher on the participating IEP team deprived M.L. of an educational opportunity.

This conclusion is unmistakable for several reasons. First, there is the IDEA's statutory preference for mainstreaming. The IDEA favors mainstreaming the education of a disabled child to "the maximum extent appropriate" given the nature of the child's disability. 20 U.S.C. § 1412(a)(5)(A).[10] When mainstreaming is pursued with a disabled child, and the child's education proceeds in the "Least Restrictive Environment," as set forth in 20 U.S.C. § 1412(a)(5)(A), the crucial purposes and requirements of IDEA are realized: The disabled child receives the benefit of observing and working with those who are not disabled, which can provide the disabled child with both educational and non-academic benefits. Children who are not disabled are given the opportunity to become better acquainted with their disabled peers, which may help avoid stereotyping, lessen prejudice, and prepare all students to work together in society. Most importantly, mainstreaming is the mechanism for fulfilling the statutory goal that the disabled child be educated in the least restrictive setting, which experience tells us is best for the child's development. *See*

---

[10]To better accomplish this goal and accommodate those disabled children who might require specialized tools and supplements, Congress mandated that a child could only be removed from the regular class environment when the "use of supplementary aids and services could not be achieved satisfactorily" in the regular educational environment. 20 U.S.C. § 1412(a)(5)(A).

*e.g.*, Alan Gartner & Dorothy K. Lipsky, *Beyond Special Education: Toward a Quality System for All Students*, 57 Harv. Educ. Rev. 367, 375 (1987) (concluding that there is a "substantial and growing" body of evidence that supports the academic and emotional developmental value of mainstreaming). The parents of disabled children do not have to prove a regular education environment is best for their children; rather, it is the school district's burden to explain in the IEP the extent to which a child cannot participate in regular education activities. 20 U.S.C. § 1414(d)(1)(A)(iv).

Second, Ms. Wicks, M.L.'s prior regular education teacher, had written to the FWSD, informing the school district that M.L. had made "good progress" in her class, which was comprised of twelve non-disabled students and four or five with "special needs," and recommending that M.L. remain in regular education during his kindergarten year. Third, the FWSD had appointed a regular education teacher to the IEP team, but inexplicably went forward with the IEP planning meeting without that teacher's presence and participation. Fourth, M.L.'s past IEP and placement demonstrated that it was at least possible to conclude that M.L. could be placed in a regular education classroom.

I certainly recognize that M.L.'s education in a regular classroom poses serious challenges for him, for classmates, for instructors, and for administration. That is clear from the record before us. But under the totality of circumstances, we cannot readily conclude that the statutory violation in not having a regular education teacher participate on the IEP team was harmless. To the contrary, there is a strong likelihood that mainstreaming opportunities for M.L. would have been better considered had a regular education teacher taken part in the program's preparation, and that more mainstreaming might have been permitted for M.L. under the IEP. Hence, I do not believe that we can properly hold that the error in IEP team composition here was harmless.

Because I conclude on this record that we must hold that the FWSD's IEP process caused a "loss of educational opportunity," and the district court's conclusion was error,[11] I need not reach the second step in the *Rowley* analysis, i.e., whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207; *see also* 28 U.S.C. § 2111 (providing that "[o]n the hearing of any appeal . . . in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties").[12]

---

[11]I reach this conclusion initially on my premise that the issue is a mixed question of fact and law, not predominantly factual in light of the IDEA's statutory preference for mainstreaming; but even if I were to view this issue under the "clear error" standard, I would still conclude that the district court's grant of summary judgment on the theory that there was no lost educational opportunity was reversible error.

[12]The dissent concludes that we must affirm because the district court found "that the program developed by the IEP team was the best placement for M.L., because it maximized the academic and nonacademic benefits available to him." Dissent at page 637. But, the district court made its findings regarding whether the IEP was reasonably calculated to enable the child to receive educational benefits without the benefit of the views and expertise of a regular classroom teacher having been expressed at the critical IEP team meeting to discuss M.L. The IDEA mandates that a regular classroom teacher be a member of the IEP team. Although I do not think a *per se* reversal follows from a violation under our precedent, there is no doubt that the inclusion of a regular education teacher on the IEP team promotes the purposes of the IDEA. We ought not to speculate here that noncompliance with the procedural standards mandated in the IDEA did not matter. Because the failure of the school district to include a regular classroom teacher on the IEP team, conjoined with the other circumstances reviewed above that made regular education for M.L. a distinct possibility, we cannot say the error was harmless. For these reasons, and because of my disagreement on the standard of review, *see supra* notes 9 and 11, I cannot agree with my dissenting colleague's conclusion that if a regular classroom teacher had participated on the IEP team "there was [not] a realistic possibility that it would have resulted in a different assignment for M.L." Dissent at page 646.

CLIFTON, Circuit Judge, dissenting:

I agree with my colleagues on many of the important issues in this case. In particular, I join in Sections I, II-A, II-C,[1] and III of Judge Alarcón's opinion, and in Section I of Judge Gould's opinion. In English, that means that I agree with both Judge Alarcón and Judge Gould that the school district should have included a regular classroom teacher on the IEP team and that the failure to do so constituted a procedural violation of the IDEA. I also agree with my colleagues that the school district's procedural error did not prevent M.L.'s parents from participating in the formation of the IEP. To the extent that M.L.'s parents enjoyed limited participation it was because the parents voluntarily removed themselves from the process. Finally, I agree with Judge Gould, as expressed in Section I of his opinion, that a structural error analysis is not supported by our caselaw and has no place in the IDEA context. As Judge Gould correctly observes, a procedural violation constitutes a denial of a free and appropriate public education only when it results in a lost educational opportunity for the child or significantly restricts parental participation in formation of the IEP.

I part with my colleagues in the application of these principles to this case, however, and reach a different conclusion. Specifically, I conclude that the failure to include a regular classroom teacher on the IEP team did not result in the loss of an educational opportunity for M.L. or deny him a free appropriate public education. Accordingly, I respectfully dissent.

---

[1]To be precise, while I agree with the main point of Section II-C, which is that the school district violated the procedural requirements of the IDEA, I do not join in the last sentence of that section. In that sentence Judge Alarcón applies the "structural defect" analysis contained in Section II-B of his opinion to reach the conclusion that the district court's judgment must be reversed. I disagree with both the structural defect approach and the conclusion. Nor do I join in the footnote accompanying that sentence.

Both of my colleagues focus on Plaintiffs' challenge to the procedures employed by the school district, which was the issue that Plaintiffs emphasized on appeal. The district court apparently concluded that the IDEA did not require the IEP team to include a regular classroom teacher, a view that all three of us on this panel agree was incorrect. The district court did not rely only on that erroneous legal conclusion to support its decision, however. Perhaps recognizing that it was a close question, the district court observed that "even if" the failure to include a regular classroom teacher amounted to a procedural violation, "such a violation would not necessarily constitute the denial of a FAPE." The district court relied on *W.G. v. Board of Trustees of Target Range School District*, 960 F.2d 1479, 1484 (9th Cir. 1992), and *Amanda J. v. Clark County School District*, 267 F.3d 877, 892 (9th Cir. 2001) — the same cases cited in my colleagues' opinions — and determined that "the question whether the alleged procedural violation amounted to the denial of a FAPE depends on whether or not M.L. suffered a substantive loss of educational opportunity." That is essentially the same legal standard adopted by a majority of our panel (consisting of Judge Gould and me), as expressed in Section I of Judge Gould's opinion. In large part, it appears, because of the way the case was framed in the arguments made by the parties, the district court went on to address that question using somewhat different terminology. Nonetheless, the district court made factual findings that point to the conclusion that M.L. did not suffer a substantive loss of educational opportunity. I agree with the district court's findings and reach the same conclusion.

Plaintiffs vigorously argued to the district court that the school district had violated the substantive requirements of the IDEA, as well as its procedural requirements. A substantive violation alleged by Plaintiffs was that the school district had failed to "mainstream" M.L. to the maximum extent possible. The plan that the IEP team prepared for M.L. did not provide for placement in a "regular" or "integrated" kindergarten classroom, as his parents wanted, but in a "self-

contained" classroom with other disabled and special education students. The district court reviewed the IEP team's plan and discussed Plaintiffs' substantive objections to it. While not framing that discussion in terms of a "loss of educational opportunity," the district court made detailed findings of fact to the effect that the program developed by the IEP team was the best placement for M.L., because that placement maximized the academic and non-academic benefits available to him.

The district court's factual findings are enlightening:

M.L. could hope to gain little academic benefit from a placement in a regular kindergarten classroom focused on developing reading skills. As the District points out, M.L. is almost completely non-verbal. He has virtually no communication skills, and at the time of his evaluation he was not yet toilet trained. His cognitive ability places him at the first percentile level on the Battelle Developmental Inventory. . . . [A] kindergarten classroom geared toward teaching children reading skills is a very different environment from preschool.

The District's experts at the due process hearing uniformly identified the special education placement at Wildwood Elementary as the superior option, and Petitioners offered no expert testimony in rebuttal.

The administrative law judge found that in a regular classroom environment M.L. would interact primarily with his one-on-one aide as opposed to his peers. . . . M.L. lacks the independent skills necessary even to socialize with other children in an integrated classroom setting. . . . The Wildwood special education placement . . . offers the best of both worlds; it teaches children with M.L.'s challenges to function without the constant presence of an adult, and it also

offers mainstreaming opportunities throughout the
week that provide opportunities for socialization
with non-handicapped children. The expert testi-
mony in this case is unanimous that Wildwood is the
least restrictive option for M.L.

The Court finds no significant non-academic benefit
to M.L. from a regular classroom placement.

[T]he Court must . . . find that M.L.'s disruptive
presence in the classroom would likely impair the
education of the normally developing children.

On balance, the Court cannot find that the District
failed to mainstream M.L. to the maximum extent
possible in developing his IEP.

The district court's factual findings are consistent with
those of the administrative law judge in the due process hearing.[2]
Her 73-page Findings of Fact, Conclusions of Law, and Order
thoroughly supports the district court's conclusion. Specifi-
cally, the administrative law judge found:

[T]he evidence establishes that [M.L.] has no
expected opportunity for making meaningful aca-
demic progress in the . . . regular education kinder-
garten classroom. . . . While some autistic children
do well in an integrated classroom if they have high
skill levels and can attend to directions, the over-
whelming evidence establishes that [M.L.] has diffi-
culty attending to directions, has very low skill
levels across all domains, and had difficulty making
transitions and learning routines. Therefore, [M.L.'s]
educational opportunities in a self-contained class-
room are better than those in a [regular] classroom.

[2]Plaintiffs did not introduce new evidence in district court. The record
before the district court (and before us) was the same record that was
before the administrative law judge.

> The level of support[ ] that [M.L.] needs will inter-fere with his ability to make non-academic progress in a regular education environment, even with a trained staff assistant. [M.L.] will be dependent on his assistant, which means he will have less opportu-nity to interact with peers. His day will be spent interacting with the adult assistant and not his peers. Therefore, placement in a general education class-room may in fact be more restrictive than a self-contained classroom.

> The evidence establishes that the self-contained classroom at Wildwood will provide [M.L.] with opportunities for socialization and modeling of peers with normal behaviors and communications skills.

> Here, the evidence establishes that [M.L.] has extremely disruptive behaviors and must be moni-tored constantly by a 1:1 aide. . . . Until [M.L.] is able to increase and generalize his receptive and expressive communication skills, and is able to attend to adult directions, he will continue displaying behaviors such as whining, crying, biting, pulling on others, scratching, laying down on the floor and throwing fits. Although this behavior would be addressed by his 1:1 aide, it would nonetheless be distracting to the teacher and the other students.

The findings by district court and by the administrative law judge constitute a factual determination that the program developed by the IEP team was the best placement for M.L. because the academic and non-academic benefits to M.L. were maximized by placement in a self-contained classroom, rather than a regular kindergarten classroom. The evidence supporting that conclusion was overwhelming. This factual determination necessarily means that, even though the IEP plan for M.L. was prepared through a procedurally flawed

process, the plan prepared by that team did not result in a loss of educational opportunity for M.L.

It is important to recognize that the district court did not simply determine that Plaintiffs failed to state a substantive violation of the IDEA. The statute requires only that a disabled student be given an "appropriate" education. There is no substantive mandate that a school district provide the best program possible. As the Supreme Court observed in *Board of Education v. Rowley*, 458 U.S. 176 (1982), the statute contains "elaborate and highly specific procedural safeguards" but only "general and somewhat imprecise substantive admonitions." 458 U.S. at 205. Thus, in reviewing actions brought under the statute, courts are instructed to make a twofold inquiry:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206-07. The Court focused on procedure because "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Id.* at 206. Accordingly, if the process used to prepare an IEP was procedurally correct, the law does not require that the services "be sufficient to maximize each child's potential." *Id.* at 198. The program need only be "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207.

We have concluded that the process used to prepare the IEP for M.L. was not procedurally correct, so a tougher substantive standard should be applied. Our caselaw defines that

tougher standard in terms of whether there has been a "loss of educational opportunity." The district court in this case also applied a tougher substantive standard. The district court not only concluded that the program prepared for M.L. was "reasonably calculated" to provide M.L. with a FAPE (the standard applicable in the absence of procedural error, under *Rowley*), but also that the plan was the *best* program for M.L. That being so, the district court properly held that even if there had been error in the composition of the IEP team, M.L. had not been denied a free appropriate public education.[3]

Our caselaw tells us that not all procedural errors amount to violations of the statute. Rather, only a procedural error that results in a lost educational opportunity violates the law. In my view, the factual findings of the district court demonstrate

---

[3]Judge Alarcón takes issue with my reliance on the district court's finding, not because he challenges the finding itself, but because he disagrees with my reliance upon that finding to conclude that the procedural error here was harmless. He criticizes my approach as being "at odds with" the two-step inquiry set forth in Supreme Court's decision in *Rowley* (and quoted in the text above), arguing that I have jumped to the substantive second step in order to circumvent the procedural first step. *Ante* at 619 n.9. I respectfully disagree. I give the same answer to the first *Rowley* question as both of my colleagues do: no, the school district has not complied with the procedures set forth in the Act. But *Rowley* does not say what happens when the answer to the first question is "no." Our court has previously held, and a majority of this panel holds again here, that a procedural error violates the Act only when it results in a lost educational opportunity for the child. There is nothing in *Rowley* which precludes consideration of the substantive impact on the child in determining whether there has been a lost educational opportunity due to a procedural error. Nor does my approach involve the second *Rowley* question. Instead, the district court applied what I described above as a "tougher substantive standard." The second question under *Rowley* asks only whether the program was "reasonably calculated" to enable the child to receive educational benefits. The district court went beyond that here to find something more, that the proposed plan was the best program for M.L. That finding relates to the second step of *Rowley* in that it considers the *substantive* impact on the child rather than the *procedural* process employed to create the plan, but it is not the same inquiry.

that M.L. did not suffer a lost educational opportunity. The program outlined by the IEP would have maximized both the academic and non-academic benefits for him, would have mainstreamed him to the maximum extent possible, and was uniformly identified by the experts who testified as superior to the regular classroom placement that M.L.'s parents sought. The statute does not require anything more than that. Even if the process leading to the program was deficient, the program itself was not, and thus the student was not injured — M.L. did not lose an educational opportunity. The IDEA should not be interpreted to impose liability on a school that seeks to provide the best possible program.

The clearly erroneous standard applies to a district court's findings of fact in IDEA cases where, as here, the decision below relied on a written administrative record.[4] *Gregory K.*

---

[4]Judge Gould maintains, at 631 n.9, that "the question of whether M.L. has 'los[t] an educational opportunity' under the IDEA is a mixed question of law and fact which we review de novo." (citing *Gregory K.*, 811 F.2d at 1310; *Target Range*, 960 F.2d 1482) (alteration in original). Our caselaw, however, provides only that the broad substantive issue — "whether the school district's proposed IEP was a free appropriate public education" — is a mixed question of fact and law that is reviewed de novo. *Gregory K.*, 811 F.2d at 1310; *accord Target Range*, 960 F.2d 1482 (internal quotation marks omitted).

The question before us is more limited: whether the procedural error at issue caused a loss of educational opportunity for M.L. That question is primarily a factual one. It requires consideration of M.L.'s physical and cognitive limitations, the placements proposed in the challenged IEP, the alternative placements, and the expert testimony and other evidence regarding the appropriate placement for M.L. The only legal component is the meaning of the phrase "a lost educational opportunity." The marked predominance of factual over legal issues in our inquiry is confirmed by the relevant portion of Judge Gould's opinion, Section II, which, in five pages of analysis, makes three factual arguments, just one legal argument, and does not cite to a single case, other than for the standard of review. Where a mixed question of law and fact is primarily factual in nature, we apply the clearly erroneous standard of review. *Amanda J.*, 267 F.3d at 887.

*v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987). For a factual finding to be considered "clearly erroneous," we must be left with the "definite and firm conviction that a mistake has been committed." *Amanda J.*, 267 F.3d at 887.

In applying the "loss of educational opportunity" standard to the facts of this case, Judge Gould's opinion does not challenge any of the district court's factual findings, let alone explain how those factual findings are "clearly erroneous." Instead, Judge Gould offers one legal reason and three factual reasons for reversing the district court. I am not persuaded.

The first reason is the statutory preference for mainstreaming to "the maximum extent appropriate." Opinion of Judge Gould, at 632 (quoting 20 U.S.C. § 1412(a)(5)(A)). Judge Gould builds on the statutory preference for mainstreaming, "when feasible," by highlighting, at 632-33, the benefits of placing disabled students in regular education settings. As the district court's order expressly stated, however, the "expert testimony in this case is unanimous that Wildwood [special education placement] is the least restrictive option for M.L." Given the entirely one-sided expert testimony regarding the appropriate placement of M.L., the district court was not wrong in concluding that the district did "mainstream M.L. to the maximum extent possible in developing his IEP." Judge Gould does not explain why the district court's detailed discussion of mainstreaming is clearly erroneous or in error under any standard of review. Nor does Judge Gould identify his reasons for believing that the IEP prepared by the school district failed to mainstream M.L. "to the maximum extent feasible." The naked observation that mainstreaming is pre-

---

The relevant finding of the district court is even narrower than that. The district court found that the placement recommended by the IEP team was the best placement for M.L. That is a purely factual determination, not a legal one or a mixed law and fact question. Thus, it should be subject to clear error review.

ferred and can be beneficial to disabled children does not mean that it is right for every single child. The findings of the district court deal with M.L. and cite unanimous expert testimony that mainstreaming for that child was not appropriate under the circumstances.

The second reason given by Judge Gould is that M.L.'s preschool teacher in the Tukwila School District, Ms. Wicks, informed the school district that M.L. had made "good progress" in her class and recommended that M.L. remain in a regular education classroom during his kindergarten year. Opinion of Judge Gould, at 633. Both the district court and the administrative law judge were aware of and considered Ms. Wicks' recommendation, as did the IEP team and the school district. Notwithstanding Ms. Wicks' recommendation, the district court and the administrative law judge both found, as a factual matter, that M.L. would be better served by the IEP prepared by the district. As the administrative law judge observed, even Ms. Wicks "admitted that she did not expect [M.L.] to achieve much academic success in a mainstream placement." And she also recognized that a regular classroom placement would not work for M.L. much longer, since, as noted by the administrative law judge, "in her opinion, the only option [M.L.] would have after one year in an integrated kindergarten would be placement in a self-contained classroom for at least part of the day and mainstream[ing] during non-academic activities." Ms. Wicks' recommendation is not nearly strong enough to support a conclusion that the district court was clearly erroneous in finding, as the administrative law judge had found, that a self-contained classroom presented the better kindergarten placement for M.L.[5] It is surely

─────────────

[5]Among other factors, I note that Ms. Wicks' recommendation for a regular kindergarten classroom placement was first made before M.L. moved with his family to the Federal Way School District. It is not surprising that the IEP team would take into account what happened during the week M.L. that subsequently spent in Ms. Ramsey's regular kindergarten classroom. As described in Judge Alarcón's opinion, at 596-97, and more extensively developed in the record, that week in a regular classroom setting was not a positive experience for M.L. or anyone else involved.

not the case that a prior preschool teacher's recommendation is determinative and binding on the school district.[6]

The third reason identified by Judge Gould, at 633, is simply the fact of the procedural violation: the failure to include a regular classroom teacher in the IEP planning meeting. But the fact that there was a procedural violation says nothing about whether that violation had a substantive impact; it is simply the reason for asking the question. Judge Gould properly rejects the per se rule applied by Judge Alarcón and recognizes that our caselaw establishes that not all procedural violations result in the denial of a FAPE. The fact of the procedural violation is not a fact indicating that M.L. actually lost an educational opportunity as a result.

The final reason given by Judge Gould, at 633, is that "M.L.'s past IEP and placement demonstrated that it was at least possible to conclude that M.L. could be placed in a regular education classroom." Anything is possible, but it is highly unlikely that including a regular classroom teacher on the IEP team would have resulted in a recommendation that M.L. be placed in a regular kindergarten classroom, as I will explain below. More importantly, as the district court found, such a placement would not have been the best placement for M.L. In being denied such a placement, he did not lose an educational opportunity. In broader terms, by proposing a placement which would have better served his needs, the school district did not fail to provide him with a free appropriate public education, the primary requirement of the IDEA.

---

[6]It is important to note the procedural posture of this case. We are not sitting in review of an ordinary summary judgment ruling, where we scour the record for disputed issues of material fact. If that were the posture, Ms. Wicks' recommendation might suffice to create a genuine issue of material fact. But here, we are asked to determine whether the district court erred in finding that M.L.'s IEP maximized his educational opportunities. Unless Ms. Wicks' recommendation outweighed the mountain of contrary evidence, including the unanimous expert testimony, we should affirm the district court.

The principal aim of the statute is to improve the education provided to the affected children. *See* 20 U.S.C. § 1400(c)(1) ("Improving educational results for children with disabilities is an essential element of our national policy . . . ."). That goal is not served by satisfying the parents' desire for a placement which would not have maximized the benefits for the child. The law could have been written to give parents of a disabled child absolute power over the placement decision, but it was not. Certainly parents should play an important role and must be included within the process, and that is a key part of the procedural obligation imposed by IDEA. But IDEA does not and should not impose liability on a school when the IEP provides for the best program for the student, though his parents want a different placement. Even if there was procedural error in preparing this IEP, the student here was not harmed.

If we need to consider what would have happened if a regular classroom teacher had participated on the IEP team, I do not think that there was a realistic possibility that it would have resulted in a different assignment for M.L. If a regular classroom teacher had been present, that teacher along with the rest of the IEP team would necessarily have considered what happened during the five days that M.L. was in Ms. Ramsey's regular kindergarten class in the Federal Way district. An instructional assistant was assigned to M.L. on a one-on-one basis because his needs were so great that he could not be dealt with as part of the class as a whole. There was a different instructional assistant every day, because each one quit after a single day. M.L. was allowed to listen to his favorite music through headphones while in class, to keep him under control, which meant that his involvement with the rest of the class was limited at best. Though M.L.'s mother thought that M.L. was teased by other students, she acknowledged herself that M.L. did not appear to be aware of it, because he had his headphones on most of the time. After five days, the mother removed M.L. from the classroom and refused to return. With that history, the proposition that Ms. Ramsey or any other regular classroom teacher would have attempted to persuade the

other IEP team members to place M.L. in another regular kindergarten classroom is dubious.

It is even more unlikely that any such person would have succeeded in persuading the other members of the IEP team. The regular classroom teacher would not have been the final decisionmaker. That teacher — be it Ms. Rowley, Ms. Wicks, or someone else — would have been only one member of the team. And the team had much more to go on than just the reports of M.L.'s previous teachers. Prior to the IEP team meeting, the district formed a separate multidisciplinary team, including a school psychologist, a speech and language pathologist, a certified occupational therapist, and M.L.'s mother, to evaluate the student. That team also recommended placement in a special education program tailored to M.L.'s needs, rather than in a regular kindergarten classroom. That recommendation matches the *unanimous* judgment of all the experts presented to the administrative law judge and the district court. Under those circumstances, it was not reasonably possible that including a regular classroom teacher in the IEP team meeting would have resulted in an IEP that placed M.L. in a regular education classroom during his kindergarten year.

My colleagues are hesitant to shrug off lightly the procedural error made here and understandably so. The procedural safeguards of the IDEA are important and should be followed in all cases. But in light of the overwhelming evidence that the self-contained placement maximized the academic and non-academic benefits for M.L., I cannot agree that the district court's factual findings were erroneous. Nor can I disagree with the conclusion of the district court that the school district did not deny M.L. a free appropriate public education. Accordingly, I respectfully dissent.